*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0385p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

MICHAEL D. WEBB,

                    *Petitioner-Appellant,*

    *v.*

BETTY MITCHELL, Warden,

                    *Respondent-Appellee.*

No. 06-4606

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 98-00766—Susan J. Dlott, Chief District Judge.

Argued: June 10, 2009

Decided and Filed: November 5, 2009

Before: ROGERS, SUTTON and GRIFFIN, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Keith A. Yeazel, LAW OFFICE, Columbus, Ohio, for Appellant. Charles L. Wille, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Keith A. Yeazel, LAW OFFICE, Columbus, Ohio, James D. Owen, THE OWEN LAW FIRM, Columbus, Ohio, for Appellant. Robert E. Prather, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

_____

**OPINION**

_____

SUTTON, Circuit Judge. A jury convicted Michael D. Webb of the aggravated murder of his son, Michael ("Mikey") Patrick Webb, and at the jury's recommendation a state trial court sentenced him to death. The Ohio courts affirmed his convictions and sentence on direct review and denied postconviction relief. Webb sought a writ of habeas corpus, which the district court denied. We affirm.

I.

Webb lived in a modest home in Goshen, Ohio, with his wife Susan, two teenage daughters, Tami and Amy, and two young sons, Charlie and Mikey. *State v. Webb*, 638 N.E.2d 1023, 1026 (Ohio 1994). Early on the morning of November 21, 1990, Tami awoke in her basement bedroom to the smell of gasoline. *Id.* at 1027. Webb soon came into her room and told a frightened Tami that he smelled gasoline and that he thought someone had "rigged" the house. *Id.* Without telling Tami to get out of the house, Webb proceeded upstairs while Tami hid under her covers. *Id.*

Soon after Webb went upstairs, an explosion occurred on the main floor of the house, throwing Webb from the hall outside the master bedroom into the bathroom. *Id.* at 1027–28. Webb's wife and youngest son were asleep in the master bedroom at the time, and Mikey slept in his bedroom across the hall. *Id.* Tami and Amy safely escaped the resulting fire through the exterior basement door as soon as they heard the explosion. *Id.* at 1027. Webb escaped the house by breaking through the bathroom window, cutting himself and bloodying his hands in the process. *Id.* Firefighters rescued Webb's wife and youngest child from the master bedroom. *Id.* Mikey died from smoke inhalation, apparently while hiding under his bed to seek refuge from the flames. *Id.*

Law enforcement investigated the cause of the fire. Fire Chief Murphy discovered a plastic gasoline can from Webb's garage in the front foyer as well as a "very definite pour pattern or trailer" leading down the hallway from the foyer to the main floor bedrooms. *Id.* From there, trailers led into both bedrooms, including over Mikey's bed to the rear wall of his bedroom. *Id.* An unignited gasoline trailer also led downstairs to the basement, where gasoline had been poured on Tami's and Amy's beds. *Id.* Several pieces of physical evidence linked Webb to the fire: a two-liter soda bottle containing gasoline found downstairs, which had Webb's fingerprints on it; Webb's partial bloody fingerprints on a matchbook outside, with the prints corresponding to the "peculiar way" Webb held a matchbook when lighting matches; and a plastic gas can from Webb's garage found in the foyer. *Id.* Webb, it turns out, had a motive as well: He began an extramarital affair in 1990 and told his mistress he planned to leave his wife so he could be with her, *id.*; and he had just

finished draining $102,000 (plus interest) from his daughters' trust accounts within the past year, a theft that would be hidden by their deaths because he was their heir.

An Ohio jury convicted Webb of the aggravated murder of Mikey and eleven other counts not relevant to this appeal. *Id.* After a mitigation hearing, the jury recommended the death penalty, and the trial court agreed. *Id.* On direct review, the state court of appeals and the Ohio Supreme Court affirmed Webb's conviction and death sentence. *Id.* at 1028, 1038. Webb sought state post-conviction relief, which the Ohio courts denied. *See State v. Webb*, No. CA96-12-108, 1997 WL 656312 (Ohio Ct. App. Oct. 20, 1997), *appeal denied*, *State v. Webb*, 690 N.E.2d 15 (Ohio 1998). He also filed a motion for reconsideration and another motion seeking reopening of his direct appeal, both to no avail. *See State v. Webb*, 708 N.E.2d 710, 711 (Ohio 1999); *State v. Webb*, 640 N.E.2d 845, 845 (Ohio 1994).

In 1998, Webb filed a federal petition for habeas corpus, which (as amended) raised fifteen claims for relief. The district court rejected the petition because Webb had procedurally defaulted several claims and the remainder failed on the merits. The district court granted a certificate of appealability on seven claims.

## II.

Because Webb filed his federal habeas petition after the effective date of the Antiterrorism and Effective Death Penalty Act, we may grant the writ with respect to claims "adjudicated on the merits in State court proceedings" only if the state-court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *id.* § 2254(d)(2).

### A.

Webb claims that Ohio violated his due process rights by failing to disclose a police report issued five days after the fire. *See Brady v. Maryland*, 373 U.S. 83, 86 (1963). The report says that Tracy Jordan, a student at Goshen High School, thought that Bob Gambrell, another student and Amy Webb's ex-boyfriend, smelled like gasoline the morning of the fire.

The report does not say who told this to the police. When officers spoke with Jordan, according to the report, she denied that Gambrell smelled like gasoline the morning of the fire. But she did tell police that Gambrell said he "hoped it was Amy's house that burnt up," and that Gambrell did not wear his red letterman's jacket to school that morning, as he often did. App'x 3202.

The report also recounts the officer's conversation with Gambrell. Gambrell at first denied even being at school that day, but then "changed his mind" and disputed Jordan's recollection of their conversation that morning. App'x 3203. According to Gambrell, he said "I hope it *wasn't* Amy's house that burnt up." *Id.* (emphasis added). Gambrell also claimed he left his jacket in a friend's car and would bring it in for examination in a few days. The record does not disclose what happened to the jacket or whether the police ever investigated Gambrell further.

Webb claims that this information, together with other evidence, shows that Gambrell committed the crime. Gambrell was the ex-boyfriend of Amy Webb; he "practically liv[ed]" at the Webb household prior to the fire, eating dinner with the family "[a] couple of times a week" according to Webb's then-wife, App'x 3510–11; he knew the layout of the house; Webb believed that Gambrell "cannot stand him" because Webb "ran him out of the house" after catching him fooling around with Amy, R.37, Ex. 2788; and Tami saw someone wearing a red sweatshirt "staring" at her just before the explosion. App'x 1868. Webb claims that, when these facts are added to the information in the police report—that Gambrell may have smelled like gasoline that morning, that Jordan allegedly heard Gambrell say he "hoped it was Amy's house that burnt up," App'x at 3202, and that Gambrell did not wear his red letterman's jacket to school that morning—it undermines confidence in the jury's verdict.

Webb did not raise his *Brady* claim in the state proceedings, but the district court excused his procedural default and reviewed the claim on the merits because Webb did not learn of the police report until federal habeas discovery. Because this claim was not "adjudicated on the merits in State court proceedings," we give fresh review to the merits of this claim—as the State concedes we should. *See Danner v. Motley*, 448 F.3d 372, 376 (6th Cir. 2006).

A *Brady* claim contains three elements:  (1) the evidence "must be favorable to the accused" because it is exculpatory or impeaching; (2) the State must have suppressed the evidence, whether willfully or inadvertently, and (3) the evidence must be material, meaning "prejudice must have ensued" from its suppression. *Strickler v. Greene*, 527 U.S. 263, 282 (1999).  The key question here is the last one:  Did the failure to turn over the police report prejudice Webb's case?  Put another way, is there "a reasonable probability that" the report "would have produced a different verdict"?  *Id.* at 281.

The 1991 police report does not satisfy this standard.  Webb's theory that Gambrell, not he, set the fire rests on an implausible chain of events.  If Webb is right, here is what happened:  Gambrell retrieved Webb's gasoline container from Webb's garage, entered the house through the basement door and doused two floors of the house with gasoline. Gambrell hid from view while Webb and Tami talked.  Gambrell stared at Tami in her basement bedroom without being identified (even though Tami knew Gambrell as her sister's ex-boyfriend), then sneaked back upstairs.  Gambrell entered the hallway connecting the upstairs bedrooms, opened the closet near the foyer and started a fire in that closet, *Webb*, 638 N.E.2d at 1028—all without Webb noticing, even though Webb stood in the same hallway when returning to the master bedroom to awaken his wife after talking to Tami, *id.* Gambrell then walked to the end of that hallway nearest the bedrooms and ignited the second fire—standing exactly where Webb claims he stood before an explosion threw him into the bathroom, *id.*  No rational jury would believe all of this transpired, particularly that Webb stood next to Gambrell when Gambrell lit the fire that caused the explosion.  How, if all of this were true, could the suppression of the police report be the reason that Webb did not identify Gambrell as the arsonist?  Webb has no answer.

Not only does this argument rest on a precarious chain of inferences, it also rests on a flimsy foundation:  that Tami saw an unidentified person in a red sweatshirt in the house shortly before the explosion.  *See Webb*, 638 N.E.2d at 1027.  Nothing else puts Gambrell or anyone else other than the Webb family inside the home on the morning—at 6 a.m.—of the fire.  The prosecutor's cross-examination of Tami at trial cast considerable doubt on the notion that she saw anyone other than her father shortly before the explosion.  How, for example, could Tami see someone "staring" at her but simultaneously claim that the face was obscured?  App'x 1868, 1878–79.  And if she could see enough to know the individual was

"staring" at her, why wouldn't she have recognized her sister's ex-boyfriend who was frequently at the house? She also conceded during cross-examination that she based her "feeling" that an unidentified person in a red sweatshirt stared at her "upon the fact that [she] could not believe" Webb started the fire. *Webb*, 638 N.E.2d 1027 (modification in original).

Several pieces of physical evidence, moreover, linked Webb to the fire. In the basement, Murphy discovered a two-liter plastic soda container, which had Webb's fingerprints on it and which still contained gasoline. *Webb*, 638 N.E.2d at 1027. Investigators also found bloody fingerprints on a matchbook outside, and Webb admitted the prints were his. *Id.* at 1028. The location of the prints also corresponds to the "peculiar way" Webb held a matchbook when lighting matches. *Id.* But, even though the police fingerprinted Gambrell in 2003 to see if his prints matched unidentified prints from the crime scene, not one piece of physical evidence links Gambrell to the fire. The State also established that Webb had a motive for setting the fire: He commenced an extramarital affair in 1990, telling his mistress he planned to leave his wife so he could be with her, *id.* at 1027, and he had finished stealing $102,000 from his daughters' trust accounts within the past year; a theft that their deaths would forever hide because he was their heir.

The information in the police report also is equivocal and does not "markedly" strengthen the theory that Gambrell set the fire. *Kyles v. Whitley*, 514 U.S. 419, 441 (1995). An unknown source says Jordan smelled gasoline on Gambrell the morning of the fire, but Jordan denies that was so. Jordan claims that Gambrell said that he "hoped it was Amy's house that burnt up." But not only would that be an odd statement for Gambrell to make had he set the fire (and not turned himself in), it also contradicts Gambrell's recollection of the conversation (he "hoped it *wasn't* Amy's house that burnt up," App'x 3203), and at any rate Jordan and Gambrell were two components of a teenage love triangle involving Amy, making the misunderstanding unsurprising. That Gambrell regularly wore a red letter jacket, that he did not wear the jacket to school the morning after the fire, that the jacket was never tested and that Tami saw someone wearing a red sweatshirt shortly before the explosion provide tenuous—in truth highly speculative—support for Webb's theory. But they do not "markedly" support it, particularly since the foundation of the point—Tami's apparent "identification" of an individual in a red sweatshirt on the night of the fire—collapsed on cross-examination. Perhaps we would see their evidence differently if this were a close case,

but it is not. All of the physical evidence points towards Webb, and the notion that Gambrell started the fire rests on an implausible sequence of events.

Resisting this conclusion, Webb argues that the evidence significantly weakens the prosecution's case by impeaching the thoroughness of the police investigation. *See Kyles*, 514 U.S. at 445. With the report, he says, he could have impeached testimony that the police followed up on all leads because he could have shown that the police never tested Gambrell's jacket. At this point, in retrospect, it is of course unfortunate that the police did not test Gambrell's jacket. But, in contrast to *Kyles*, the undisclosed police report would not have "revealed a remarkably uncritical attitude on the part of the police" regarding the "crucial . . . evidence" in the case. *Kyles*, 514 U.S. at 445. The marginal relevance of the information in the report together with the implausibility by the time of trial that anyone other than Webb committed the crime leave no reasonable probability that the verdict would have been different if Webb had been given the report.

Webb adds that police records indicating another person had a motive and opportunity to commit the crime are always material. Not true. Whether the information is material turns on the nature of the link between the other person and the crime and whether it affects how a jury would view a central issue in the case. *See Banks v. Dretke*, 540 U.S. 668, 698, 701–02 (2004).

Suppressing the 1990 police report, Webb also argues, prejudiced his trial preparation and presentation. Any impact the suppression had on Webb's trial preparations is irrelevant, however; "only the effect on the trial's outcome matters." *Wilson v. Parker*, 515 F.3d 682, 702 (6th Cir. 2008). And we have shown why no reasonable probability exists that, had the 1990 police report been disclosed, the outcome would have been different.

B.

Webb separately argues that the Ohio appellate courts violated his rights under the *Ex Post Facto* and Due Process Clauses by reviewing his sufficiency-of-the-evidence challenge under a tougher standard than the one that existed on the day he committed the crime (or stood trial). At the time of the murder, Ohio courts would not uphold a conviction premised on circumstantial evidence unless it was "consistent only with the theory of guilt

and irreconcilable with any reasonable theory of innocence." *State v. Kulig*, 309 N.E.2d 897, 899 (Ohio 1974). A jury verdict thus would stand only if no reasonable trier of fact could have *acquitted* the defendant. *See York v. Tate*, 858 F.2d 322, 330 (6th Cir. 1988); *State v. Jenks*, 574 N.E.2d 492, 497 (Ohio 1991). Within a year of the murder, the Ohio Supreme Court abolished the distinction between direct and circumstantial evidence, establishing that a jury verdict stands if "any reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." *Jenks*, 574 N.E.2d at 503; *accord Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

Webb raised this issue—that the state courts should have applied the old standard, not the new one—on direct review, but the Ohio Supreme Court rejected it and applied the *Jenks* standard in affirming his conviction. *Webb*, 638 N.E.2d at 1029–30. Because the Ohio Supreme Court assessed Webb's challenges on the merits, AEDPA's deferential standard of review applies. Under AEDPA, we look to the law as it stood on the date the Ohio Supreme Court adjudicated Webb's claim when assessing whether its decision contradicted or unreasonably applied clearly established U.S. Supreme Court precedent. *See Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003).

Webb's *ex post facto* challenge goes nowhere. As the Ohio Supreme Court correctly recognized, *Webb*, 638 N.E.2d 1029 n.1, the *Ex Post Facto* Clause "does not of its own force apply to the Judicial Branch," *Marks v. United States*, 430 U.S. 188, 191 (1977). The Ohio Supreme Court's rejection of Webb's *ex post facto* challenge is not just reasonable; it is entirely consistent with U.S. Supreme Court precedent.

The answer to Webb's due process challenge is less obvious, but in the end he cannot show that the state courts unreasonably applied then-existing U.S. Supreme Court precedent in rejecting this challenge. Relying on *Collins v. Youngblood*, 497 U.S. 37 (1990), the state court concluded that the fair-warning requirements of the Due Process Clause, *Bouie v. Columbia*, 378 U.S. 347 (1964), incorporated the requirements of the *Ex Post Facto* Clause and applied them jot-for-jot to the judiciary. *See Webb*, 638 N.E.2d at 1029 n.1, 1030. Later U.S. Supreme Court precedent rejected this view, holding that the judiciary is bound by "concepts" of fair warning, which does not encompass "jot-for-jot the specific categories" of the *Ex Post Facto* Clause. *Rogers v. Tennessee*, 532 U.S. 451, 459 (2001). But that does

not make the state court's *pre-Rogers* determination unreasonable. At least two precedents at the time suggested the clauses were coextensive. *See Bouie*, 378 U.S. at 353–54, 362 ("If a state legislature is barred by the *Ex Post Facto* Clause from passing such a law, it must follow that a State Supreme Court is barred by the Due Process Clause from achieving precisely the same result by judicial construction."); *Marks*, 430 U.S. at 192 (same). Our own precedents pointed in the same direction. Before and after *Webb*, we held that the two clauses were co-extensive, *see Gall v. Parker*, 231 F.3d 265, 305 (6th Cir. 2000); *Dale v. Haberlin*, 878 F.2d 930, 934–35 (6th Cir. 1989), making it difficult to second guess the reasonableness of the state court's efforts to make sense out of the same precedents.

Nor can we fault the state court's conclusion that *Youngblood* "establishes that new evidentiary rules [including sufficiency-of-the-evidence rules] may be applied retroactively." *Webb*, 638 N.E.2d at 1030. *Youngblood* upheld a statutory change that allowed courts to reform improper jury verdicts, reasoning that these kinds of after-the-crime procedural changes fell outside of the *Ex Post Facto* Clause. After parsing the Court's precedents and searching for the original meaning of the Clause, *Youngblood* concluded that the Clause "addressed . . . laws, whatever their form, which make innocent acts criminal, alter the nature of the offense, or increase the punishment." 497 U.S. at 46 (internal quotation marks omitted). This definition conspicuously omitted alterations to the "legal rules of evidence"—part of Justice Chase's well-known definition of *ex post facto* laws in *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390 (1798). *See Youngblood*, 497 U.S. at 43 n.3, 46. If *Youngblood* could say that *ex post facto* requirements (and thus due process requirements) do not extend to evidentiary rules, the Ohio Supreme Court reasonably could conclude that they do not extend to standards of review.

Even though the Ohio Supreme Court never analyzed Webb's challenge under the *Bouie* line of cases, its decision is neither contrary to nor an unreasonable application of these cases. All of these cases involved judicial decisions that allegedly retroactively converted an innocent act into a crime. *See Osborne v. Ohio*, 495 U.S. 103, 116–17 (1990); *Splawn v. California*, 431 U.S. 595, 601 (1977); *Marks*, 430 U.S. at 195–96; *Rose v. Locke*, 423 U.S. 48, 53 (1975); *Hamling v. United States*, 418 U.S. 87, 115–16 (1974); *Douglas v. Buder*, 412 U.S. 430, 432 (1973); *Rabe v. Washington*, 405 U.S. 313, 315–16 (1972); *Bouie*, 378 U.S. at 354–55. None involved appellate standards of review or evidentiary

determinations. *Jenks* also changed a common-law doctrine, *see York,* 858 F.2d at 330, yet all of the U.S. Supreme Court cases involved judicial interpretations of statutes, *see Osborne v. Ohio*, 495 U.S. at 116–17 (summarizing cases).

Webb says that we should give fresh review to the state court's decision rather than deferentially reviewing it under AEDPA because the state court analyzed his claim only under the *Ex Post Facto* Clause. Not true. Acknowledging that *ex post facto* requirements do not apply to judicial decisions, the Ohio Supreme Court interpreted *Bouie* to place "similar constraints" on courts through due process. *Webb*, 638 N.E.2d at 1029 n.1. So while the state court relied on *ex post facto* cases, it addressed Webb's due-process fair-warning claims. We thus cannot give unconstrained, non-AEDPA review to his claims and thus have no basis for reviewing his claims under *Rogers*, 532 U.S. 451, which postdates the Ohio Supreme Court's decision by seven years.

C.

Webb argues that his trial counsel provided constitutionally ineffective assistance during the penalty phase of his trial by failing adequately to investigate and present mitigating evidence. In state post-conviction proceedings, the Ohio Court of Appeals found this claim barred by *res judicata* and did not address it on the merits. *State v. Webb*, No. CA96-12-108, 1997 WL 656312, at *2 (Ohio Ct. App. 1997). The district court held Webb did not procedurally default this claim, however, and proceeded to review the claim on the merits. We thus give fresh review to the merits of this claim—as the State concedes we should.

To prevail, Webb must show that his counsel's performance was deficient and that he was prejudiced as a result. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To show prejudice, Webb must demonstrate that, but for counsel's poor performance, "there is a reasonable probability" the result would have been different. *Id.* at 694. In the penalty-phase investigation context, that requires producing evidence Webb's trial counsel should have uncovered that "differs in a substantial way—in strength and subject matter—from the evidence actually presented." *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005).

Webb's trial counsel obtained a psychological evaluation of Webb, but chose not to present any psychological evidence during the penalty phase. He instead presented nine family members, including Webb's then-wife and daughters, and one close family friend. Webb also made an unsworn statement to the jury. Counsel argued that Webb should not receive a death sentence mainly because (1) he could continue to contribute to his family's welfare if allowed to live, (2) the living victims of Webb's crimes—his family—wanted to spare his life, and (3) residual doubt about Webb's guilt favored leniency. (At the district court's habeas hearing, it bears noting, his ex-wife testified against him and his children no longer testified in support of him.)

Webb argues that the mitigation investigation was "appallingly inadequate," R. 41 at 67, and submits four affidavits purporting to show why. The first is from Michel Coconis, Webb's mitigation investigator, whom trial counsel hired three days before the guilt phase began. Coconis points to several factors that she believes rendered her investigation incompetent, including too many other commitments at the time, being hired too close to trial, speaking to family members only in group settings and talking to family members only when the guilt-phase proceedings dominated their thoughts.

James Owens, a capital defense attorney in Ohio, submitted the second affidavit. He provides a bullet-point how-to manual for capital defense litigation. In commenting on Webb's mitigation investigation, he says that a failure adequately to investigate "evidence of mitigation" constituted one "of the many errors made by [Webb]'s trial counsel without any possible potential strategic purpose." App'x 3960–61. Martin D. Yant's affidavit speaks to the inadequacy of trial counsel's investigation at the guilt phase of the trial.

The final affidavit, from a psychologist named Jeffrey Smalldon, critiques counsel's choice not to present any psychological mitigating evidence. Smalldon also criticizes the decision by trial counsel to hire a psychological expert, Richard Sexton, with no experience in mitigation preparation or forensic psychology and who ultimately did not testify. In Smalldon's opinion, loose language in Sexton's report, not properly couched in appropriate qualifiers, could have hurt Webb during mitigation had Sexton testified. Smalldon also opined that Sexton's failure to do a "comprehensive psychological, psychosocial, and possibly neuropsychological inquiry" did not serve Webb well. App'x 3313–14.

While some of these affidavits may well identify legitimate critiques of counsel's performance, they do not establish prejudice. The Coconis, Owens and Yant affidavits do not point to any evidence that differs substantially—in strength and subject matter—from the evidence Webb's counsel possessed. *See Hill*, 400 F.3d at 319. The three affidavits, indeed, fail to point to *any* evidence that the allegedly deficient investigation failed to uncover.

While the Smalldon affidavit attempts to demonstrate prejudice, it does not do so. Smalldon presents a more nuanced and troubling picture of Webb's mental health than Sexton does, ultimately diagnosing him with "prominent passive-aggressive, paranoid, and antisocial features." App'x 3940. He also speculates that Webb sometimes "totally disregards important aspects of reality in the course of responding to some deep-seated emotional need," such as being a "heroic figure" for his family. *Id.* But Smalldon bases his assessment primarily on reports created by Webb's trial counsel and interviews with Webb, which Sexton also conducted. Smalldon thus merely develops a different psychological profile based on the same facts Sexton apparently used, making it difficult to maintain that Sexton (and Webb's counsel) failed to uncover mitigating evidence that a later investigation uncovered. *See Hill*, 400 F.3d at 315–16; *Smith v. Mitchell*, 348 F.3d 177, 201–02 (6th Cir. 2003); *cf. Rompilla v. Beard*, 545 U.S. 374, 390–93 (2005) (defense counsel failed to uncover history of mental illness, severe privation and abuse); *Wiggins v. Smith*, 539 U.S. 510, 534–35 (2003) (same).

We also cannot reliably evaluate how much of Sexton's report differs from Smalldon's, or any other aspect of Sexton's performance, further hamstringing a cognizable prejudice argument. Smalldon—a psychologist specifically hired during post-conviction proceedings to evaluate possible ineffective-assistance defenses—provides the only record of Sexton and his findings. For reasons never explained, Webb has not introduced Sexton's report in any state or federal post-conviction proceeding. While we do not doubt the competence or good faith of Smalldon, that does not make him an objective evaluator of Sexton's work. On this record—which does not contain Sexton's report and does not contain any newly uncovered facts that Webb's counsel (Sexton) should have discovered earlier—Smalldon cannot help Webb overcome "the strong presumption" that his trial

counsel conducted a reasonable investigation. *Campbell v. Coyle*, 260 F.3d 531, 553 (6th Cir. 2001).

One loose end: Why didn't Webb's counsel nonetheless introduce Sexton's report or at least offer Sexton as a witness? One possibility, as confirmed by Smalldon, is that the report contained information potentially damaging to Webb's mitigation theory. The other is the tension that may arise between a residual doubt theory and psychological testimony. Psychological evidence may conflict with a residual doubt theory at mitigation because, to be persuasive, it simultaneously must explain how the defendant's psychological makeup could lead him to commit the murder but mitigate the circumstances of his doing so. *See McCracken v. Gibson*, 268 F.3d 970, 980 (10th Cir. 2001).

But even if the Smalldon affidavit estalished prejudice, which it did not, Webb did not make a sufficient showing of deficient performance. His counsel's decision not to introduce Sexton's psychological evaluation, which described Webb as cold and violent, was not unreasonable because this evaluation would have undermined Webb's mitigation theory that he could contribute to his family's welfare if allowed to live. Because Sexton's initial evaluation was unfavorable, Webb's counsel's decision not to seek a more extensive psychological evaluation was also reasonable.

### D.

Webb claims that the prosecutor violated his due-process rights during the guilt phase by commenting on Webb's failure to testify, by taunting Webb and by presenting character evidence even though Webb did not testify. This misconduct, Webb adds, also infected the penalty phase because the trial judge instructed the jury to consider all of the guilt-phase evidence when evaluating whether to impose the death penalty. To obtain relief, the prosecutorial misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process," *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (internal quotation marks omitted), and the state court's contrary ruling on the point must have been unreasonable.

Under the Fifth (and Fourteenth) Amendment, the prosecution may not comment on a defendant's refusal to testify. *See Griffin v. California*, 380 U.S. 609, 614 (1965). In

arguing that the prosecution's guilt-phase summation violated this prohibition, Webb focuses on one incident. During a lunch recess near the end of the trial, one of the prosecutors (Breyer) was in the courtroom with Webb and a court deputy. Breyer told Webb that he could not believe Webb would stoop low enough to blame his daughters as part of his defense. (This exchange does not appear in the trial transcript, but Breyer tacitly admitted it occurred, *see* App'x 2949). Two hours later, another prosecutor (White) concluded his rebuttal summation by standing "five to six feet" from Webb and declaring "[t]hat man right there in that chair killed his son. That man right there in that chair tried to kill every single person in his house." App'x 2901K, 2904. Webb then burst out "[y]ou're wrong," and White responded "[h]e spoke" before finishing his summation. App'x 2901K.

Webb claims the prosecutor's remark that "[h]e spoke" "naturally and necessarily" commented on Webb's refusal to testify and that this represented a deliberate strategy since Breyer's earlier remark primed Webb for an outburst. Pet'r Br. at 71–72. The Ohio courts did not unreasonably apply *Darden* and *Griffin* in concluding otherwise. Whether a prosecutor's comment violates the Fifth Amendment turns on content and context: (1) Did the prosecutor "manifestly intend[]" to comment on the defendant's Fifth Amendment right or would a jury "naturally and necessarily" interpret the remark that way; (2) was it an isolated occurrence or part of an extensive pattern; (3) how strong was the prosecution's other evidence and (4) did the judge give a curative instruction? *Bowling v. Parker*, 344 F.3d 487, 514 (6th Cir. 2003).

No evidence shows that White "manifestly intended" to comment on Webb's refusal to testify. The isolated remark more plausibly reflected surprise and a plea for the judge to restore order during the climax of his summation. *See Byrd v. Collins*, 209 F.3d 486, 534 (6th Cir. 2000) (finding no manifest intent where benign, equally plausible explanations exist). Even though a lawyer might have interpreted the remark as commenting on Webb's Fifth Amendment rights, a lay juror would not "naturally and necessarily" reach that conclusion. *See id.* Breyer's earlier remark, while inappropriate and unethical, does not change matters. It is highly unlikely that a prosecutor could plausibly think that this remark would so inflame Webb that, two hours later, he would speak out, giving another prosecutor an opportunity to sneak in an oblique reference to Webb's silence at the end of the

summation. The trial judge also mitigated any harm from White's comment by instructing the jury on Webb's Fifth Amendment rights during his general instructions to the jury.

Webb persists that fourteen other statements during the prosecution's summation also commented on Webb's refusal to testify. Taken together with the first statement, Webb urges, these statements show a pattern of improper comments that infected the entire trial.

Four of the statements refer to evidence as uncontradicted. But that kind of reference does not reflect on a defendant's failure to testify if evidence other than the defendant's own testimony could have contradicted it. *See Joseph v. Coyle*, 469 F.3d 441, 474 (6th Cir. 2006); *Raper v. Mintzes*, 706 F.2d 161, 164 (6th Cir. 1983).

Seven other statements merely summarize the evidence. Prosecutors may "summarize the evidence and comment on its quantitative and qualitative significance" during their summation, *see Bowling*, 344 F.3d at 514, which includes responding to the defense's "reasonably likely contentions and tactics," *Bedford v. Collins*, 567 F.3d 225, 233 (6th Cir. 2009), and recounting testimony about the defendant's knowledge and conversations. Prosecutors also have "leeway" during their summation to argue "reasonable inferences from the evidence." *Byrd v. Collins*, 209 F.3d 486, 535 (6th Cir. 2000). Webb makes no attempt to demonstrate how the seven statements overstep these bounds.

Two more statements occurred during the prosecution's rebuttal summation. But these refer to defense counsel and his summation, not to Webb.

That leaves the last statement, in which the prosecution referred to a piece of evidence as "uncontradicted" that only Webb could have contradicted. *See Raper*, 706 F.2d at 164–65. But the Supreme Court has not held that such comments invariably violate *Griffiin*, *id.*, and Webb makes no attempt to show that the Ohio Supreme Court unreasonably applied *Griffin* in finding this remark permissible. Even if the statement did cross the line, moreover, it does not establish an extensive pattern in the context of the prosecution's summation, which spanned ninety-four pages of transcript, and the trial, which spanned 1,500 pages.

Webb's claim about the prosecutor's introduction of other-acts evidence fares no better. While framed as a prosecutorial-misconduct challenge, it amounts in the end to a

challenge to the trial court's decision to allow the introduction of this evidence. *See Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001). "A prosecutor may rely in good faith on evidentiary rulings made by the state trial judge and make arguments in reliance on those rulings," *Cristini v. McKee*, 526 F.3d 888, 900 (6th Cir. 2008), and a trial court violates due process only if admitting the evidence under state law violates "fundamental conceptions of justice." *Dowling v. United States*, 493 U.S. 342, 352–53 (1990). Webb makes no attempt to show how the admission of this evidence violated this standard or how the Ohio Supreme Court unreasonably applied or contradicted *Dowling* in rejecting this claim. And we doubt he could prevail on any such argument because the evidence that Webb contests plausibly goes to motive as well as to character. *Cf. Leavitt v. Arave*, 383 F.3d 809, 829 (9th Cir. 2004) (holding other-acts evidence violates due process if the evidence "goes only to character and there are *no* permissible inferences the jury may draw from it" (internal quotation marks omitted)).

### III.

Webb next challenges the district court's conclusion that Webb procedurally defaulted two of his ineffective-assistance-of-counsel claims. A habeas petitioner procedurally defaults a claim if: (1) the petitioner fails to comply with a state procedural rule; (2) the state courts enforce the rule; (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim; and (4) the petitioner cannot show cause and prejudice excusing the default. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).

### A.

The district court erred, Webb says, in holding that he procedurally defaulted his claim that trial counsel acted ineffectively by failing to object to a penalty-phase jury instruction. In orally instructing the jury on its obligation to balance the aggravating and mitigating factors, the trial judge apparently had a slip of the tongue:

> To outweigh means to weigh more, to be more important than. In this regard, it is the *quantity* of the evidence that must be given consideration by you, and the quality of the evidence may or may not be commensurate with the quantity of the evidence . . . .

App'x 3149 (emphasis added). The trial judge refused to give the jurors written copies of the instructions, which did not contain this error, even after the jurors asked for them. Webb's trial counsel never brought the error to the attention of the trial judge or requested that the judge re-instruct the jury.

Under Ohio law, defendants generally must raise ineffective assistance of trial counsel claims on direct review, *see Greer v. Mitchell*, 264 F.3d 663, 674 (6th Cir. 2001), although this rule was in flux at the time of Webb's direct appeal in the early 1990s. *See Franklin v. Anderson*, 434 F.3d 412, 418 (6th Cir. 2006); *State v. Murnahan*, 584 N.E.2d 1204, 1207–09 (Ohio 1992) (establishing rule that defendants could not raise ineffective-assistance claims in post-conviction proceedings). Webb obtained new counsel on appeal, who raised twenty-six issues on direct review, including several ineffective-assistance claims. *See Webb*, 638 N.E.2d at 1034, 1037. But Webb's counsel did not appeal the jury instruction or argue ineffective assistance for failing to object to that instruction. Webb subsequently raised this ineffective assistance claim in state post-conviction proceedings, but the Ohio courts found it barred by *res judicata*. *See Webb*, 1997 WL 656312, at *5–6.

Webb then moved to reopen his direct appeal under Ohio Rule of Appellate Procedure 26(B), the prescribed mechanism for asserting ineffective assistance of appellate counsel claims under Ohio law, *see* Ohio R. App. P. 26(B)(1). The Ohio Court of Appeals rejected the claim as time barred and without merit. *See* App'x 1422–23; *see also State v. Webb*, 708 N.E.2d 710, 711 (Ohio 1999). On the merits, the Ohio Court of Appeals recognized that the U.S. Supreme Court has held that effective appellate counsel should select the best claims on appeal, not every non-frivolous claim, to maximize the likelihood of success. *See Jones v. Barnes*, 463 U.S. 745, 751–52 (1983). Accordingly, it held that picking and choosing between various ineffective-assistance claims on direct review was not objectively unreasonable.

Webb does not deny that he procedurally defaulted his ineffective-assistance claim with respect to his trial counsel. He argues instead that the claim with respect to his appellate counsel amounts to cause and prejudice excusing the default. *See Smith v. Ohio Dept. of Rehabilitation and Corrections*, 463 F.3d 426, 432 (6th Cir. 2006).

We agree with Webb that he did not procedurally default the appellate-counsel claim by filing an untimely Rule 26(B) motion. We have previously held that the time limitation in Rule 26(B) is not an independent state ground that the Ohio courts have enforced for capital-sentence petitioners whose direct appeal had concluded, and whose post-conviction relief proceedings were initiated, after *Murnahan*. *See Franklin*, 434 F.3d at 420–21; *cf. Beuke v. Houk*, 537 F.3d 618, 632 (6th Cir. 2008). Ohio's Rule 26(B) time bar accordingly does not satisfy one of the *Maupin* requirements for procedural default. *Franklin*, 434 F.3d at 420.

Deferential AEDPA review still governs our consideration of Webb's ineffective assistance of appellate counsel claim, however, because the Ohio courts also addressed this claim on the merits. *See Brooks v. Bagley*, 513 F.3d 618, 624 (6th Cir. 2008). Ineffective assistance of appellate counsel claims are governed by the same *Strickland* standard as ineffective assistance of trial counsel. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000). (*Robbins*, by the way, guides our analysis even though the Supreme Court decided *Robbins* after the Ohio courts ruled on Webb's Rule 26(B) motion because *Robbins* merely explains *Strickland* without creating a new rule. *See West v. Bell*, 550 F.3d 542, 552 n.3 (6th Cir. 2008)).

The Ohio courts did not unreasonably apply *Strickland*'s deficiency or prejudice prongs. To establish deficient performance, Webb must demonstrate his appellate counsel made an objectively unreasonable decision by choosing to raise other issues instead of this ineffective assistance of trial counsel issue, meaning that issue "was clearly stronger than issues that counsel did present." *Robbins*, 528 U.S. at 285, 288.

Webb's ineffective assistance of trial counsel claim is not "clearly stronger" than the issues he raised on direct review. When reviewing a death sentence on direct review, O.R.C. § 2929.05(A) requires Ohio courts independently to "weigh the aggravating circumstances against the mitigating factors and consider whether the death sentence is disproportionate to sentences in similar cases," which the Ohio courts did in this case, *see Webb*, 638 N.E.2d at 1037. The Ohio Supreme Court has consistently held that this "careful independent reweighing" cures errors by the jury or trial court in "weighing the aggravating circumstances against any mitigating factors," *State v. Lott*, 555 N.E.2d 293, 304 (Ohio

1990)—including erroneous penalty-phase jury instructions, *see State v. Cook*, 605 N.E.2d 70, 83 (Ohio 1992). *See Nields v. Bradshaw*, 482 F.3d 442, 451 (6th Cir. 2007). Even if Webb's trial counsel performed deficiently, it is highly unlikely that appellate counsel could have established prejudice from the deficient performance since independent review cured any harm from his failure to object. An obviously meritless claim is never "clearly stronger" than the claims raised on direct appeal.

Webb also cannot establish prejudice even if this claim were "clearly stronger" than some of the twenty-six issues raised on direct appeal. To establish prejudice, Webb must demonstrate "a reasonable probability that, but for his counsel's unreasonable failure to" raise this issue on appeal, "he would have prevailed." *Robbins*, 528 U.S. at 285. The Ohio Supreme Court's independent review cured any potential harm from the failure to object, so the result of the appeal would have been the same even if his appellate counsel had raised this claim. Because the Ohio courts properly held Webb's appellate counsel did not perform ineffectively, Webb has not established cause and prejudice excusing the procedural default of his ineffective trial counsel claim.

Webb offers two rejoinders. He first argues that he is actually innocent and that his innocence establishes the requisite cause to excuse a procedural default "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Murray v. Carrier*, 477 U.S. 478, 496 (1986). But Webb misunderstands how we apply the actual innocence test. Webb grounds his actual innocence claim in the alleged *Brady* violation we rejected earlier; he cannot excuse procedural default on this issue by establishing a different constitutional violation "probably resulted in the conviction of one who is actually innocent," *Schlup*, 513 U.S. at 327 (internal quotation marks omitted). Webb must show that *this* constitutional violation "probably resulted in the conviction of one who is actually innocent."

Webb next argues it does not matter whether he can show cause and prejudice because he did not procedurally default this claim in the first place. According to Webb, when the Ohio courts engage in the statutory independent review process, *see* O.R.C. § 2929.05(A), they implicitly review ineffective assistance of trial counsel claims. Thus, the argument goes, this claim does not implicate Ohio's *res judicata* rule.

We accepted an implicit review theory once before. *See Cone v. Bell*, 359 F.3d 785, 790–94 (6th Cir. 2004), *rev'd on other grounds Bell v. Cone*, 543 U.S. 447 (2005). In *Cone*, the petitioner included in his habeas petition an Eighth Amendment vagueness challenge to an "especially heinous, atrocious and cruel" aggravator the jury relied upon in imposing a death sentence. *See id.* at 788, 790. When the warden argued that Cone had procedurally defaulted this claim by not raising it in the state courts, Cone responded that "the Tennessee Supreme Court 'necessarily reviewed' the claim as part of its mandatory death penalty review." *Id.* at 789–90.

We agreed—based on the language of Tennessee's mandatory independent review statute and a Tennessee Supreme Court decision. *Id.* at 791–93. The statute requires the Tennessee Supreme Court to review whether "the sentence of death was imposed in an arbitrary fashion." Tenn. Code. Ann. § 39-2-205(c) (current version at Tenn. Code Ann. § 39-13-206(c)); *see also Cone*, 359 F.3d at 790. The decision, *State v. West*, held Tennessee courts had implicitly reviewed an Eighth Amendment vagueness challenge as part of their mandatory statutory review under § 39-2-205. *See* 19 S.W.3d 753, 754, 756 (Tenn. 2000); *see also Cone*, 359 F.3d at 791–92. Due only to the language of the statute and the decision in *West*, we concluded that Tennessee courts implicitly review Eighth Amendment vagueness challenges on direct review, meaning that the claims were not procedurally defaulted even though not explicitly raised on direct review. *See Cone*, 359 F.3d at 792–93. We limited our holding, however, to Eighth Amendment vagueness challenges, as only those challenges had statutory and decisional support. *Id.* at 793.

*Cone* is readily distinguishable. First, nothing in Ohio's independent review statute hints that Ohio courts implicitly review the performance of counsel during their mandatory review. *See* O.R.C. § 2929.05(A). Second, we are unaware of a single Ohio case that embraces the implicit review theory in any context, let alone in the context of an ineffective assistance claim.

Webb disagrees, citing a number of cases in which the Ohio Supreme Court reviewed issues not properly preserved below but explicitly raised on appeal when reviewing death-penalty convictions. To the extent the Ohio courts review these improperly preserved claims for plain error, that does not save the claims from procedural default. *See Coleman v.*

*Thompson*, 501 U.S. 722, 741 (1991); *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006). It requires a significant "conceptual leap" at any rate to go from reviewing claims not properly preserved, but explicitly raised, to claims that were never raised at all. *Cone*, 359 F.3d at 792–93. We decline to make that leap today without any Ohio authority for attempting it.

B.

Webb challenges the district court's conclusion that he procedurally defaulted numerous ineffective-assistance claims during the guilt phase. But nothing can come of this challenge because the district court also rejected these claims on the merits and Webb did not ask for a certificate of appealability on the merits determinations with respect to these claims. No court thus could grant the writ on this basis even if we held that these claims were not procedurally defaulted.

While we are generally not in the business of reversing certificates of appealability, *see Porterfield v. Bell*, 258 F.3d 484, 485 (6th Cir. 2001), it bears repeating what is required before one can be issued. To obtain a COA on an issue, a petitioner must show that "reasonable jurists would find the district court's assessment of the constitutional claim[] debatable or wrong." *Miller-El v. Cockrell*, 537 U.S. 322, 338 (2003). This inquiry is straightforward when a district court denies a constitutional claim on the merits. But where the district court denies an issue on procedural grounds without evaluating the merits of the underlying constitutional claim, courts should grant a COA only if two requirements are satisfied. *See Slack v. McDaniel*, 529 U.S. 473, 484–85 (2000). *First*, the court must determine that reasonable jurists would find the district court's procedural assessment debatable or wrong. *Id.* at 484. *Second*, the court must determine that reasonable jurists would find it debatable or obvious that the petitioner states a valid underlying constitutional claim on the merits. *Id.* If the petitioner cannot make both of these showings, assessed in whatever order, then a court should not grant a COA on the procedural issue. *Id.*

This framework faithfully applies the text of 28 U.S.C. § 2253—requiring "a substantial showing of the denial of a constitutional right" before courts may grant a COA—while not making procedural rulings unreviewable. *See Slack*, 529 U.S. at 484. By contrast, it does violence to the text of § 2253—a jurisdictional statute, *see Hill v. Mitchell*,

400 F.3d 308, 329 (6th Cir. 2005)—when courts grant COAs without assessing the debatability of the underlying merits.

IV.

For these reasons, we affirm.