[Cite as *State v. Webb*, 2014-Ohio-2894.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

STATE OF OHIO,                               :

     Plaintiff-Appellee,                   :

           - vs -                              :

MICHAEL D. WEBB,                             :

     Defendant-Appellant.                  :

CASE NO. CA2014-01-013

O P I N I O N
6/30/2014

CRIMINAL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 90CR05505

D. Vincent Faris, Clermont County Prosecuting Attorney, Nicholas Horton and Judith Brant, 76 South Riverside Drive, 2nd Fl., Batavia, Ohio 45103, for plaintiff-appellee

Kimberly S. Rigby and Daniel P. Jones, 250 East Broad Street, Suite 1400, Columbus, Ohio 43215, for defendant-appellant

**S. POWELL, P.J.**

{¶ 1} Defendant-appellant, Michael D. Webb, appeals from the decision of the Clermont County Court of Common Pleas denying his motion for leave to file a delayed motion for new trial over two decades after he was sentenced to death for attempting to murder his entire family by dousing his house with gasoline and setting it on fire, killing his three-year-old son. For the reasons outlined below, we affirm.

**Facts and Procedural History**

{¶ 2}   In the early morning hours of November 21, 1990, Webb's three-year-old son, Michael ("Mikey") Patrick Webb, was killed in a fire at his Goshen, Clermont County, Ohio home.  Following a jury trial, Webb was convicted of the aggravated murder of his son and sentenced to death.  Webb was also convicted of several counts of attempted aggravated murder, as well as counts of aggravated arson and aggravated theft.  The relevant facts leading to Webb's conviction have been stated repeatedly, most recently by the United States Sixth Circuit Court of Appeals in *Webb v. Mitchell,* 586 F.3d 383 (6th Cir.2009). Those facts as stated by the Sixth Circuit are as follows:

> Webb lived in a modest home in Goshen, Ohio, with his wife Susan, two teenage daughters, Tami and Amy, and two young sons, Charlie and Mikey.  Early on the morning of November 21, 1990, Tami awoke in her basement bedroom to the smell of gasoline.  Webb soon came into her room and told a frightened Tami that he smelled gasoline and that he thought someone had "rigged" the house.  Without telling Tami to get out of the house, Webb proceeded upstairs while Tami hid under her covers.
>
> Soon after Webb went upstairs, an explosion occurred on the main floor of the house, throwing Webb from the hall outside the master bedroom into the bathroom.  Webb's wife and youngest son were asleep in the master bedroom at the time, and Mikey slept in his bedroom across the hall.  Tami and Amy safely escaped the resulting fire through the exterior basement door as soon as they heard the explosion.  Webb escaped the house by breaking through the bathroom window, cutting himself and bloodying his hands in the process.  Firefighters rescued Webb's wife and youngest child from the master bedroom. Mikey died from smoke inhalation, apparently while hiding under his bed to seek refuge from the flames.
>
> Law enforcement investigated the cause of the fire.  Fire Chief Murphy discovered a plastic gasoline can from Webb's garage in the front foyer as well as a "very definite pour pattern or trailer" leading down the hallway from the foyer to the main floor bedrooms. From there, trailers led into both bedrooms, including over Mikey's bed to the rear wall of his bedroom.  An unignited gasoline trailer also led downstairs to the basement, where gasoline had been poured on Tami's and Amy's beds.  Several pieces of physical evidence linked Webb to the fire: a two-liter

soda bottle containing gasoline found downstairs, which had Webb's fingerprints on it; Webb's partial bloody fingerprints on a matchbook outside, with the prints corresponding to the "peculiar way" Webb held a matchbook when lighting matches; and a plastic gas can from Webb's garage found in the foyer. Webb, it turns out, had a motive as well: He began an extramarital affair in 1990 and told his mistress he planned to leave his wife so he could be with her, and he had just finished draining $102,000 (plus interest) from his daughters' trust accounts within the past year, a theft that would be hidden by their deaths because he was their heir.

(Internal citations omitted.) *Id.* at 387-388.

{¶ 3} On direct appeal, this court overruled Webb's 26 assignments of error and affirmed his conviction and death sentence in *State v. Webb*, 12th Dist. Clermont No. CA91-08-053, 1993 WL 181988 (May 24, 1993). The Ohio Supreme Court affirmed our decision in *State v. Webb*, 70 Ohio St.3d 325 (1994), and later denied Webb's motion for reconsideration in *State v. Webb*, 70 Ohio St.3d 1472 (1994). The United States Supreme Court subsequently denied certiorari in *Webb v. Ohio*, 514 U.S. 1023, 115 S.Ct. 1372 (1995).

{¶ 4} Webb then filed a petition for postconviction relief, which this court denied in *State v. Webb*, 12th Dist. Clermont No. CA96-12-108, 1997 WL 656312 (Oct. 20, 1997). The Ohio Supreme Court declined review of that decision in *State v. Webb*, 81 Ohio St.3d 1443 (1998). Webb also filed a motion seeking to reopen his direct appeal with this court, which was denied in *State v. Webb*, 12th Dist. Clermont No. CA91-08-053 (July 7, 1998) (Entry Denying Application for Reopening). The Ohio Supreme Court later affirmed this court's decision denying Webb's motion to reopen his direct appeal in *State v. Webb*, 85 Ohio St.3d 365 (1999).

{¶ 5} Webb next filed a petition for a writ of habeas corpus with the United States District Court for the Southern District of Ohio. As part of his petition, Webb alleged the state violated his constitutional rights and *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194 (1963), by failing to disclose purported exculpatory and material evidence to his defense counsel.

After holding a hearing on the matter, the District Court denied Webb's petition for a writ of habeas corpus in *Webb v. Mitchell*, S.D.Ohio No. 1:98-CV-766, 2006 WL 3333842 (Nov. 14, 2006). The Sixth Circuit subsequently affirmed the District Court's decision in *Webb v. Mitchell*, 586 F.3d 383 (6th Cir.2009), and the United States Supreme Court again denied certiorari in *Webb v. Bobby*, 559 U.S. 1076, 130 S.Ct. 2110 (2010).

{¶ 6} On February 26, 2013, over three years after the Sixth Circuit's decision denying his petition for a writ of habeas corpus, and well over two decades after being sentenced to death, Webb filed a motion with the trial court requesting leave to file a delayed motion for a new trial alleging claims of prosecutorial misconduct, insufficient evidence, newly discovered evidence and ineffective assistance of counsel. After reviewing the extensive briefing and exhibits on the matter, the trial court denied Webb's motion without a hearing in an entry filed on December 30, 2013.

{¶ 7} Webb now appeals from the trial court's decision denying his motion for leave to file a delayed motion for a new trial, raising three assignments of error for review. For ease of discussion, Webb's three assignments of error will be addressed together.

{¶ 8} Assignment of Error No. 1:

{¶ 9} THE TRIAL COURT ERRED BY FAILING TO GRANT WEBB A NEW TRIAL GIVEN THE EXISTENCE OF TWO ALTERNATIVE SUSPECTS AND NEWLY DISCOVERED FIRE SCIENCE THAT CONTRADICTS THE TRIAL COURT THEORY AS TO THE FIRE'S POINT OF ORIGIN, THUS DENYING WEB HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL.

{¶ 10} Assignment of Error No. 2:

{¶ 11} THE STATE'S COMPOSITE FAILURES TO PROVIDE WEBB WITH MATERIAL EVIDENCE THAT POTENTIALLY COULD EXONERATE HIM DENIED HIM A FAIR TRIAL.

{¶ 12} Assignment of Error No. 3:

{¶ 13} THE TRIAL COURT ERRED BY FAILING TO GRANT WEBB A NEW TRIAL BASED UPON ADVANCES IN THE SCIENCE OF ARSON INVESTIGATIONS, THUS DENYING WEBB HIS RIGHTS TO DUE PROCESS AND A FAIR TRIAL.

{¶ 14} Under his three assignments of error, Webb argues the trial court erred by denying his motion for leave to file a delayed motion for a new trial based on alleged "newly discovered" evidence of the existence of two alternative suspects resulting from the state's purported *Brady* violations. Webb also argues the trial court erred by denying his motion for leave to file a delayed motion for a new trial in light of the new advances in so-called "fire science" which he alleges calls into question the state's theory regarding the origins of the fire presented at trial. According to Webb, when viewed either individually or when taken together, this supposed "new evidence" undermines the jury's verdict, thereby entitling him to a new trial.[1] We disagree.

### The State Did Not Commit a *Brady* Violation Requiring a New Trial

{¶ 15} Initially, Webb argues the trial court erred by denying his motion for leave to file a delayed motion for a new trial because the state committed a *Brady* violation in failing to provide his defense counsel with alleged exculpatory and material evidence. Specifically, Webb argues the state committed a *Brady* violation in failing to disclose: (1) a November 26, 1990 police report from the Goshen Township Police Department that referenced another potential suspect, Robert Gambrell, Webb's then teenage daughter Amy's former boyfriend; as well as (2) purported evidence from Jackie Allen, an acquaintance of Webb as a teenager, who claims she provided evidence to the Miami Township Police Department shortly after the

---

1. The state argues the evidence is not "newly discovered" under Crim.R. 33, and therefore, Webb's motion should be denied as untimely. While we may agree with the state's allegations, because this is an appeal from a case involving the death penalty, we choose to forego judgment on these potential procedural maladies and address the merits of Webb's claims for purposes of deciding this appeal.

fire that an individual named "Bob" confessed to the crime as a paid hit man.

*Standard of Review for New Trial Based on an Alleged Brady Violation*

{¶ 16} Generally, "the decision to grant or deny a motion for a new trial is within the sound discretion of the trial court and should not be disturbed on appeal absent a showing of abuse of discretion." *State v. Nicholas*, 12th Dist. Butler No. CA2006-10-260, 2008-Ohio-628, ¶ 9, citing *State v. Scheibel*, 55 Ohio St.3d 71 (1990), paragraph one of the syllabus. However, "[s]ince the failure to disclose material, exculpatory evidence violates a defendant's Fourteenth Amendment right to due process, an appellate court reviewing a trial court's resolution of a motion for a new trial claiming a *Brady* violation utilizes a due process analysis rather than an abuse of discretion analysis." *State v. Carr*, 12th Dist. Clermont No. CA2004-01-006, 2005-Ohio-417, ¶ 7, citing *State v. Johnston*, 39 Ohio St.3d 48, 59 (1988); *State v. Keith*, 192 Ohio App.3d 231, 2011-Ohio-407, ¶ 41 (3d Dist.). "We must therefore determine whether the prosecution has suppressed evidence that is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *State v. Mills*, 12th Dist. Butler No. CA99-11-198, 2001 WL 237096, *4 (Mar. 12, 2001).

{¶ 17} "As a rule, undisclosed evidence is not material simply because it may have helped the defendant to prepare for trial." *State v. Brown*, 115 Ohio St.3d 55, 2007-Ohio-4837, ¶ 49. Rather, "[e]vidence suppressed by the prosecution is 'material' within the meaning of *Brady* only if there exists a 'reasonable probability' that the result of the trial would have been different had the evidence been disclosed to the defense." *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, ¶ 27, citing *Kyles v. Whitley*, 514 U.S. 419, 433-434, 115 S.Ct. 1555 (1995). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, ¶ 129, quoting *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375 (1985).

*The November 26, 1990 Police Report Referencing Robert Gambrell as a Potential*

*Alternative Suspect is Not Material Evidence Requiring a New Trial*

{¶ 18} We first address the November 26, 1990 police report from the Goshen Township Police Department referencing Gambrell as a potential alternative suspect in the fire. As relevant here, the police report states Tracy Jordan, a student attending Goshen High School, thought Gambrell, her former boyfriend who sat next to her in school, smelled like gasoline on the morning of the fire. The report does not state who told the police this information. Nevertheless, when officers spoke with Jordan, the report indicates Jordan denied ever making a statement that she thought Gambrell smelled of gasoline that morning. The report also notes that Jordan denied Gambrell exhibited any physical injuries. The report does state, however, that Jordan told officers that Gambrell said he "hoped it was Amy's house that burnt up," and that she knew Gambrell was planning to "run away" to Florida, "but had no intention of taking Amy." The report also indicates Jordan told officers that Gambrell did not wear his red letterman's jacket to school on the morning of the fire, something which he often did, and that he was "acting strange."

{¶ 19} Continuing, the report states that one of the officers then spoke with Gambrell who, although first denying being at school that morning, later "changed his mind" and admitted he was at school after being dropped off by a friend. The report next states Gambrell told the officer he had been at home with his family on the night of the fire. The report also indicates Gambrell denied making any statement regarding his hopes that Amy's house had burned down. Instead, the report indicates Gambrell told the officer that he actually stated the exact opposite, in that he hoped "it wasn't Amy's house that burned." In addition, when asked about his red letterman's jacket, the report indicates Gambrell told the officer he left his jacket in an acquaintance's car, but that he would locate it and bring it in for an examination. The record does not contain any references as to whether Gambrell ever turned his jacket over to police, or whether the police ever investigated Gambrell further.

{¶ 20} According to Webb, the state committed a *Brady* violation by failing to provide him with the police report because its disclosure would have bolstered his defense theory that someone else started the fire. However, the record before this court firmly establishes Webb already attempted to place the blame for the fire on others; namely, James Pursifull, an ex-employee at Webb's body shop, as well as Ben Puckett, Webb's mistress' ex-husband. There is also evidence in the record that Webb at one time attempted to blame his daughter Tami for starting the fire, but that he has since abandoned that theory.

{¶ 21} Based on its finding of guilt, the jury clearly rejected Webb's defense theory that someone else started the fire – whether that be Pursifull, Puckett, Gambrell, Tami, or, as discussed more fully below, some other mysterious assailant. Because the jury found beyond a reasonable doubt that Webb intentionally started the fire that ultimately killed Mikey, his three-year-old son, we fail to see how the November 26, 1990 police report would have had any impact on the outcome of the trial had the evidence been disclosed prior to trial. This is particularly true given the extensive and overwhelming evidence establishing Webb's guilt, which, as noted above, includes a vast array of physical evidence implicating him in the crime, as well as a clearly defined motive for wanting his entire family dead.

{¶ 22} In ruling on this matter, a District Court magistrate found that even if it were to assume Gambrell made the alleged comment indicating he hoped it was Amy's house that burned down, the statement was not exculpatory, and showed, at worst, "that he would not have suffered regret if it had been her house. A spoken expression or desire is not the equivalent of striking a match." *Webb*, 2006 WL 3333842 at *29. The magistrate also discounted any allegations attributed to Jordan that Gambrell smelled of gasoline, as she later denied ever making the comment when interviewed by police. *Id.* Concluding, the magistrate determined the state's failure to disclose the November 26, 1990 police report did not constitute a *Brady* violation as it "would not have created a reasonable probability that the

confidence of the trial would be undercut." *Id.* The District Court later affirmed and adopted the magistrate's decision in full.

**{¶ 23}** The Sixth Circuit reached the same conclusion in its decision denying Webb's petition for a writ of habeas corpus. As the Sixth Circuit stated as part of its decision:

> The marginal relevance of the information in the report together with the implausibility by the time of trial that anyone other than Webb committed the crime leave no reasonable probability that the verdict would have been different if Webb had been given the report.

*Webb*, 586 F.3d at 390.

In so holding, the Sixth Circuit specifically stated:

> Perhaps we would see their evidence different if this were a close case, but it is not. All of the physical evidence points towards Webb, and the notion that Gambrell started the fire rests on an implausible sequence of events.

*Id.* at 390-391.

**{¶ 24}** In reviewing this matter, the trial court determined "[t]here is no reasonable probability that, had this report been disclosed to the defense, the result of the trial would have been different and, as such, this evidence was not material." We find no error in the trial court's decision. Therefore, as the November 26, 1990 police report cannot be said to constitute material evidence as there is no reasonable probability that the result of the trial would have been different, the state did not violate Webb's due process rights by failing to provide his defense counsel with the police report prior to trial. Accordingly, Webb's arguments regarding the November 26, 1990 police report are overruled.

*The Purported Evidence from Jackie Allen Regarding the "Mysterious Bob" as an Alternative Suspect is Not Material Evidence Requiring a New Trial*

**{¶ 25}** We next address the purported evidence from Allen, an acquaintance of Webb when she was a teenager, who claims she provided evidence to the Miami Township Police Department shortly after the fire that an individual named "Bob" confessed to the crime as a

paid hit man. According to Allen's signed affidavit dated September 12, 2012, "Bob," who stood approximately 5'10" tall with black hair and a goatee, worked at the Swifty's gas station across the street from her apartment located in Milford, Ohio. Several days after the fire, Allen claims "Bob" saw her outside and motioned for her to come over to the gas station. Upon arriving at the gas station, Allen claims "Bob" told her "he needed to talk," and that she agreed to meet "Bob" at her apartment later that day after he got off work.

{¶ 26} At approximately 11:00 p.m. that night, Allen claims "Bob" came to her apartment "saying that there was something he needed to tell me, stating first that I was a trustworthy person." Allen, however, does not provide any information in her affidavit regarding her relationship with "Bob," or how he came to the conclusion that she was a trustworthy person. Rather, Allen merely states:

> Bob then asked me if I was aware of the Webb fire. He then told me that he did something that he was not proud of and that a father was going to prison, and his (Bob's) boss was pissed. Bob told me I should clear this man's name. My understanding was that Bob was asking me to clear Mike Webb's name in connection with the fire that killed Webb's son. Bob was shaking as he spoke. He did not reveal any names.

Allen claims "Bob" then told her that there would be a bag on her front porch the next morning, but did not say what would be in the bag. Allen alleges "Bob" then left her apartment, never to be seen again.

{¶ 27} Continuing, Allen claims the next morning she found a blue gym bag sitting on her porch that contained a red sweatshirt, a candy bar wrapper, a pack of cigarettes, a black notebook, and a letter addressed to her from "Bob." In the letter, Allen claims "Bob" said "boss man pissed, and a father is accused of murder, job went bad." Allen also claims the letter stated "'the family was supposed to be on vacation,'" but that the "boy was under bed, died in fire, boss got pissed." Allen then claims the letter stated "Bob" was going to leave the country as his boss was going to have him killed, and that she should "give the bag to the FBI

because Bob did not think the local police could be trusted."

{¶ 28} Allen alleges she then opened the black notebook, which contained the "names, dates, and descriptions of, presumably, what Bob, or someone, did to each person named." According to Allen, the notebook included the name Sherry Apgar, a woman she knew and who she claimed "disappeared in 1989-90. She had yet to be found." Allen claims she then called the police and informed them that she had information regarding the Webb case. The affidavit does not state which police department she supposedly called. After calling police, Allen then alleges three police officers came to her apartment; namely, Officer Fred Fatute, an officer by the name of "Ron," as well as the chief of police, whom she could not specifically identify by name. Allen then concludes her affidavit by stating:

> I let the officers inside and showed them the bag, its contents, and the letter. I explained everything that transpired between me and Bob. Before leaving, I asked the Chief if he was going to turn the bag over to the FBI, but the Chief just replied, 'we got our man.' I had no further contact with the police regarding this incident. No one else from law enforcement or a prosecutor's office ever contacted me about the events described in this affidavit.

In her affidavit, Allen claims she decided to now come forward with these allegations because she "heard on the news in 2012 that Webb was going to be executed[.]"

{¶ 29} On March 19, 2013, Allen was interviewed by officers from the Clermont County Sheriff's Office regarding the contents of her September 12, 2012 affidavit and her recollection of the events surrounding her meeting with "Bob." A transcript and audio recording of the interview is contained as part of the record. In the interview, Allen claims she first met "Bob" at the Swifty's gas station when she would go into the store to purchase soda pop for her kids and cigarettes for her mother. During one of these trips, which Allen claims was just a few days after the fire, "Bob" asked if he could stop by her apartment because he had to talk to her about something. Although providing a variety of dates, Allen

insisted that this conversation occurred when it was summer and still warm outside. It is undisputed that the fire occurred on November 21, 1990.

{¶ 30} Allen then claims that "Bob" went to her apartment that evening during which time the following conversation took place:

> He goes, "Tomorrow morning when you put the kids on the bus there's going to be something by your door." Well, I was like, "What?" He was real shaky. And he goes, "I did something so stupid." He goes, "I'm going to be going away now." He goes, "You might not never see me again." And I was like, "What did you do, kill somebody?" I made a joke about it, okay. Ha, ha. And he got real serious, he goes, "That's not funny." He goes, "Listen to me." He said, "I'm involved in something, you'll just read… just take the bag, Jackie, just take the bag and call the FBI. Do not call Goshen. Do not call Miami Township. You call the FBI."

{¶ 31} The next day, Allen claims a blue gym bag was outside her apartment door that contained a "red jacket" that "stunk real, real bad," as well as a candy bar wrapper, a pack of cigarettes, a black notebook, and a letter addressed to her from "Bob" as stated in her affidavit. When asked about the contents of the notebook, Allen again stated it contained the name Sherry Apgar, with a notation that she was "still missing." This name stuck out to Allen because she claims to have had a child with James Apgar, Sherry Apgar's uncle.

{¶ 32} After receiving the bag from "Bob," Allen claims she then called the Miami Township Police Department. When asked why she called Miami Township instead of the Goshen Township Police Department where the fire took place and who was conducting the investigation, Allen stated that she "knew the cops, okay…[.]" Allen then claims that four officers arrived at her apartment, including Officer Fatute and the chief. According to Allen, after speaking with police, the chief took the blue gym bag from her and told her that "he'd take care of it." When making this comment, however, Allen claims the officers "all grinned at each other like they wasn't going to do nothing about it."

{¶ 33} Allen also claims that after handing the gym bag over to the chief, she met up

with a few Miami Township officers at a local golf course. Although she could not remember all of their names, Allen did specifically reference Officer Fatute, as well as officers named "Markus," "Sam" and "Ron." During this time, Allen claims she asked Officer Fatute what they did with the bag, to which he allegedly responded, "You just be quiet, don't worry about that. We got our man." Allen then claims the following conversation occurred:

> "You guys are cops" I said, "You guys are being really shitty." And I said, "You guys are really" you know. And they kept telling me, "Don't worry about it, we've got our man." And I said, "But I don't think Mike did it." I said, you know, I said, "You guys, this Bob guy at the gas station" and they said, "Just shut up, Jackie, if you know what's good for you." So I didn't take that very well. I had an attitude back then.

{¶ 34} After providing her story, the officers conducting the interview informed Allen that Swifty's gas station did not open until March 19, 1993, nearly two years after the fire, and that nobody named Bob, Robert, or even Dick, matching her description of "Bob" worked at the gas station either before or after that date. The officers also informed Allen that Sherry Apgar, who she claims was listed as "still missing" in the black notebook she allegedly received from "Bob" shortly after the fire, did not go missing until 1999, some eight years after the fire. When asked to explain these discrepancies, Allen stated that she actually did not know when she got the bag from "Bob," that she had been drinking heavily during that time, and that she suffered a series of concussions that may have affected her memory.

{¶ 35} Moreover, when shown her September 12, 2012 affidavit, Allen claimed she had been working with an FBI agent named "Mark," who had her "real affidavit" that was different and "up to date" as opposed to the "wrong affidavit" the officers had during her interview. It is undisputed that Webb submitted the same affidavit – the affidavit Allen claims was "wrong" – to the trial court in support of his motion for a new trial. As Allen stated: "there is a lot of stuff on this first affidavit * * * [t]hat is wrong and I had to cross out, resign, redate." Allen also stated, "Mark, the FBI guy has got the real affidavit that I had to resign and date,"

and that "he had to rewrite it, they even rewrote it all for me, I signed and initialed everything." Allen even went so far as to claim "Mark" told her that police had "destroyed the evidence" she received from "Bob."

{¶ 36} According to Webb, just like the November 26, 1990 police report discussed above, the evidence Allen allegedly provided to police regarding the so-called "mysterious Bob" is also material as it references yet another alternative suspect that would have likewise bolstered the defense theory that someone else started the fire. However, after a thorough review of the record, we find there are serious doubts as to whether this evidence from "mysterious Bob" ever existed. For instance, in an affidavit from Goshen Township Chief of Police Ray C. Snyder, the chief officer responsible for the investigation, Chief Snyder claimed he was not familiar with Allen, and that he has never been contacted by Allen during the years immediately after the fire, nor had he been contacted by Allen at any other time since. Chief Snyder's affidavit also states that he never received any information from Officer Fatute, the Miami Township Police Department, "or any other police officer dealing with any contact with, interview of or evidence from Jackie Allen."

{¶ 37} The record also contains an affidavit from Officer Fatute, who stated that while he did respond to the fire at the Webb's residence, he was never involved in the subsequent investigation. In addition, just like Chief Snyder, Officer Fatute also claimed Allen never contacted him regarding the fire or the charges against Webb, and that he has never received any statements or evidence from Allen related to the fire at Webb's residence.

{¶ 38} That said, even assuming the evidence did exist, as we stated previously, based on the jury's finding of guilt, the jury clearly rejected Webb's defense theory that someone else started the fire in his home. Simply stated, given the extensive and overwhelming evidence establishing Webb's guilt, the jury found beyond a reasonable doubt that Webb intentionally started the fire that ultimately killed Mikey, his three-year-old son. In

light of the jury's guilt finding, we once again fail to see how this evidence would have had any impact on the outcome of the trial.

{¶ 39} As the trial court found in reviewing this matter, "there is no credible evidence before the court that the blue gym bag and its contents as set forth by Allen ever existed," nor is there any "credible evidence that this alleged evidence was ever given to the state," thus no *Brady* violation occurred. We again find no error in the trial court's findings. Therefore, even assuming the evidence from "mysterious Bob" did exist, because the evidence was not material, the state did not violate Webb's due process rights by failing to provide his defense counsel with the alleged evidence prior to trial. Accordingly, Webb's arguments regarding Allen's claims referencing a "mysterious Bob" are overruled.

*The Trial Court Did Not Err by Denying Webb's Request for an Evidentiary Hearing*

{¶ 40} Webb also claims it was error for the trial court to reject Allen's allegations contained within her September 12, 2012 affidavit without first holding an evidentiary hearing on the matter. However, just as the trial court found, and with which we certainly agree, Allen's allegations contained within her affidavit are inconsistent and full of unexplained discrepancies when compared to her March 19, 2013 interview with officers from the Clermont County Sheriff's Office. As noted above, the audio recording of the interview was also part of the record, thereby allowing the trial court to consider Allen's credibility. Moreover, as the trial court explicitly stated:

> The court finds that [Allen's] affidavit was wholly discredited by the factual inaccuracy regarding Sherry Apgar, as this one fact led to an unraveling of many different key contentions in Allen's affidavit. Including the timing of when this entire incident with "Bob" allegedly occurred. In her interview, Allen also revealed several other inaccuracies or, at the very least half-truths, set forth in her affidavit.

We find no error with the trial court's findings.

{¶ 41} Even more telling, however, is the fact that it was Allen herself who claimed her

affidavit Webb submitted to the trial court in support of Webb's motion for leave to file a delayed motion for a new trial contained "a lot of stuff * * * that is wrong," and that her "real affidavit" was with "Mark," the alleged FBI agent with whom she claims to have been working with for nearly a year.[2] In turn, just as the state aptly points out as part of its appellee brief, it was not the trial court that discredited Allen's affidavit, but Allen herself. If the trial court were to hold an evidentiary hearing, this would only serve as yet another opportunity for Allen to contradict her already inconsistent statements contained within her affidavit and subsequent interview regarding her alleged meeting with the "mysterious Bob." We see no reason for the trial court to engage in such a futile act. The trial court, therefore, did not abuse its discretion by refusing to hold an evidentiary hearing on the matter.

**Evidence Regarding the New Advances in "Fire Science" Does Not Entitle Webb to a New Trial**

{¶ 42} Next, Webb argues that in light of the new advances in so-called "fire science," he is entitled to a new trial because this alleged "new evidence" calls into question the state's theory regarding the origins of the fire presented at trial.

*Standard of Review for a New Trial Based on Alleged "Newly Discovered" Evidence*

{¶ 43} As this evidence does not implicate *Brady*, the standard of review regarding this alleged "newly discovered" evidence is different than that which we applied in addressing the state's alleged *Brady* violations. Rather, to prevail on a Crim.R. 33(A)(6) motion for a new trial on the ground of alleged "newly discovered" evidence, such as the case here, the movant must demonstrate the evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could

---

2. We note that in its appellee brief the state claims "Mark," the alleged FBI agent working with Allen, is actually Mark Rooks, an investigator with the public defender's office, an allegation that is confirmed through a March 25, 2013 recorded telephone conversation between the Clermont County Sheriff's Office and Allen. The recording was submitted as an exhibit to the state's motion in opposition to Webb's motion for leave to file a delayed motion for a new trial.

not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence. *State v. Williams*, 12th Dist. Butler No. CA2003-01-001, 2003-Ohio-5873, ¶ 27, citing *State v. Petro*, 148 Ohio St. 505 (1947), syllabus.

{¶ 44} "Crim.R. 33 motions for a new trial are not to be granted lightly." *State v. Thornton*, 12th Dist. Clermont No. CA2012-09-063, 2013-Ohio-2394, ¶ 21, citing *City of Toledo v. Stuart*, 11 Ohio App.3d 292, 293 (6th Dist.1983). The decision as to whether to grant a new trial on the grounds of newly-discovered evidence rests within the trial court's discretion, and the trial court's decision will not be reversed absent an abuse of that discretion. *State v. Clark*, 12th Dist. Warren No. CA2008-09-113, 2009-Ohio-2101, ¶ 24. An abuse of discretion implies that the trial court's decision was unreasonable, arbitrary, or unconscionable. *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, ¶ 130.

*The Evidence Regarding the New Advances in "Fire Science" Merely Impeaches and Contradicts the Evidence Presented at Trial and Does Not Create a Strong Possibility that the Evidence Will Change the Outcome of the Trial*

{¶ 45} In support of this claim that he is entitled to a new trial based on the new advances in so-called "fire science," Webb has submitted a report from Dr. Gerald L. Hurst, an expert in the field specializing in the cause and origin of fires and explosions. According to Dr. Hurst's report, based on more recent experimental work with gasoline spills, "it can be shown that the area of origin of the fire could have been anywhere on the main floor." However, just as the trial court found, Dr. Hurst's report does not aver that the conclusions set forth by the state through the testimony of Fire Chief Murphy "were impossible or not supported by the evidence."

{¶ 46} Instead, Dr. Hurst's report merely states that Fire Chief Murphy's "methodology is not supported by modern fire science and that the fire could have started anywhere on the first floor." This includes the closet and the hallway by the bathroom – both of which are

located on the first floor of Webb's home – where Fire Chief Murphy testified the fire originated. Therefore, just as the trial court found, this evidence does nothing more than impeach and contradict the evidence presented by the state at trial. This is an insufficient basis on which to grant a motion for a new trial.

{¶ 47} In addition, after a thorough review of the record, we are not convinced that this alleged "newly discovered" evidence would have had any impact on the jury's finding of guilt. Webb likens Dr. Hurst's report to DNA evidence, thereby conclusively establishing his innocence. Such an analogy, however, is completely misplaced and gives far too much weight to Dr. Hurst's theory regarding the fire's place of origin. Simply stated, unlike DNA evidence, Dr. Hurst's report cannot be construed as definite proof that Webb did not start the fire. Rather, Dr. Hurst's report merely disputes the state's theory that the fire likely started in the first floor bathroom, an area near where Webb was admittedly standing at the time of the initial blast, and where an additional open book of matches was located in the toilet.

{¶ 48} Furthermore, even when considering the disputed nature of the fire's place of origin, there is still ample evidence to support Webb's conviction. As the trial court found:

> [T]his new evidence does not call into question much of what the jury heard in this case – the defendant's motives, his opportunity, his strange action of not telling [Tami] to exit the house despite believing the house was "rigged" with gasoline, the matchbook found with his fingerprint on it consistent with the way he lit matches, his fingerprints found on a 2-liter bottle containing gasoline, the lack of reliable evidence placing any person outside the Webb family in the house that morning, the fact that Webb initially lied to a family member about how the bathroom window was broken, and the fact that Webb was standing on the first floor near a gasoline vapor trail where the fire could have started when the fire ignited.

In addition, as the Ohio Supreme Court found in reviewing this case on direct appeal:

> To sum up: physical evidence linked Webb to the gasoline, the matches, and the fire's point of origin. He had strong motives to kill. He lied to his family about the fire. A reasonable trier of fact, viewing the evidence in the light most favorable to the state,

- 18 -

could have found him guilty.

*Webb*, 70 Ohio St.3d at 332.

{¶ 49} "Where the case has been tried to a jury, the task for the trial judge is to determine whether it is likely that the jury would have reached a different verdict if it had considered the newly discovered evidence." *State v. Lindsey*, 12th Dist. Brown No. CA2003-07-010, 2004-Ohio-4407, ¶ 12, quoting *Dayton v. Martin*, 43 Ohio App.3d 87, 90 (2d Dist.1987). Based on the extensive and overwhelming evidence establishing Webb's guilt, we find there is simply no reasonable probability that the outcome of the trial would have been any different had the jury been able to hear this alleged "newly discovered" evidence regarding the new advances in so-called "fire science." Our finding is further supported by the fact that Webb already provided expert testimony as part of his defense at trial refuting the state's claims regarding the origins of the fire. The jury clearly rejected this theory. Therefore, Webb's arguments regarding this so-called "fire science" evidence advanced through Dr. Hurst's report are also overruled.

### The Cumulative Nature of the Alleged "Newly Discovered" Evidence Does Not Entitle Webb to a New Trial

{¶ 50} Finally, Webb claims that when taken together and viewed in a cumulative nature, this supposed "newly discovered" evidence regarding the two alternative suspects, Robert Gambrell and the "mysterious Bob," as well as the new advances in so-called "fire science" advanced by Dr. Hurst's report, undermines the jury's verdict, thereby requiring a new trial. However, as discussed more fully above, none of this evidence creates any significant doubt in the jury's verdict requiring a new trial. This is true regardless of whether such evidence is viewed individually or in a cumulative nature, as Webb now suggests. Again, the evidence establishing Webb's guilt is extensive and overwhelming. Therefore, Webb's argument regarding the cumulative nature of the alleged "newly discovered"

evidence is also overruled.

## Conclusion

{¶ 51} There is no credible evidence that anyone other than Webb doused his house in gasoline before setting it on fire, killing Mikey, his three-year-old son. Therefore, we find no error in the trial court's decision denying Webb's motion for leave to file a delayed motion for a new trial. Accordingly, having found no merit with any of the arguments advanced by Webb herein, Webb's three assignments of error are overruled.

{¶ 52} Judgment affirmed.

PIPER and M. POWELL, JJ., concur.